## No. 23-50894

---

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

JACK MILLER, ANNABEL CAMPBELL, MATTHEW PESINA, LISA
PESINA, M. P., A MINOR; J. G., A MINOR
*Plaintiffs - Appellants*

v.

CHIEF JOSEPH SALVAGGIO, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES; OFFICER JIM WELLS, DETECTIVE, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES; DAVID ANDERSON, LIEUTENANT, IN HIS
INDIVIDUAL CAPACITY; RUBEN SAUCEDO, FORMER LEON VALLEY
CAPTAIN, IN HIS INDIVIDUAL CAPACITY; JOHNNY VASQUEZ,
OFFICER, IN HIS INDIVIDUAL CAPACITY; TERRY BROOKS,
DETECTIVE, IN HIS INDIVIDUAL CAPACITY; ALEX KING, DETECTIVE,
IN HIS INDIVIDUAL CAPACITY; RUDOLFO MUNOZ, DETECTIVE, IN HIS
INDIVIDUAL CAPACITY; ERIKA RIVERA, OFFICER IN HER INDIVIDUAL
CAPACITY,
*Defendants - Appellees*

---

**On Appeal from the United States District Court for the
Western District of Texas, San Antonio Division
SA:20-CV-00642-JKP**

---

# BRIEF FOR APPELLANTS

*Counsel listed on Inside Cover*

**Brandon J. Grable**
Texas State Bar No. 24086983
brandon@g2.law
**Grable Grimshaw, P.L.L.C.**
1603 Babcock Road Suite 280
San Antonio, TX 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**ATTORNEY FOR PLAINTIFFS-
APPELLANTS**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for Appellant certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| J. Salvaggio | Charles S. Frigerio, Hector X. Saenz of Law Offices of Charles S. Frigerio, San Antonio, TX |
| J. Wells | Charles S. Frigerio, Hector X. Saenz of Law Offices of Charles S. Frigerio, San Antonio, TX |
| D. Anderson | Charles S. Frigerio, Hector X. Saenz of Law Offices of Charles S. Frigerio, San Antonio, TX |
| R. Saucedo | Charles S. Frigerio, Hector X. Saenz of Law Offices of Charles S. Frigerio, San Antonio, TX |
| J. Vasquez | Charles S. Frigerio, Hector X. Saenz of Law Offices of Charles S. Frigerio, San Antonio, TX |
| T. Brooks | Charles S. Frigerio, Hector X. Saenz of Law Offices of Charles S. Frigerio, San Antonio, TX |
| A. King | Charles S. Frigerio, Hector X. Saenz of Law Offices of Charles S. Frigerio, San Antonio, TX |
| R. Munoz | Charles S. Frigerio, Hector X. Saenz of Law Offices of Charles S. Frigerio, San Antonio, TX |
| E. Rivera | Charles S. Frigerio, Hector X. Saenz of Law Offices of Charles S. Frigerio, San Antonio, TX |

| Appellants: | Counsel for Appellants: |
| --- | --- |
| J. Miller | Brandon Grable of Grable Grimshaw, P.L.L.C. San Antonio, TX |
| Annabel Campbell | Brandon Grable of Grable Grimshaw, P.L.L.C. San Antonio, TX |
| M. Pesina | Brandon Grable of Grable Grimshaw, P.L.L.C. San Antonio, TX |
| L. Pesina | Brandon Grable of Grable Grimshaw, P.L.L.C. San Antonio, TX |
| M.P, a Minor | Brandon Grable of Grable Grimshaw, P.L.L.C. San Antonio, TX |
| J.G., a Minor | Brandon Grable of Grable Grimshaw, P.L.L.C. San Antonio, TX |

*S/ Brandon J. Grable*
BRANDON J. GRABLE
Attorney of Record for Plaintiffs-Appellants
Date: March 27, 2024

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs-Appellants respectfully request the Court grant oral argument. This case involves questions of constitutional import that may impact future decisions of this Court and lower courts. A clear understanding of the facts and evidence will be lacking absent an oral dialogue. Accordingly, Plaintiffs-Appellants believe that oral argument would aid the decisional process and benefit the Court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................... iii

TABLE OF CONTENTS ........................................................................................ iv

TABLE OF AUTHORITIES .................................................................................. vi

JURISDICTIONAL  STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUES ............................................................................. 2

STATEMENT OF THE CASE ................................................................................ 4

   I.       Proceedings Below ...................................................................................... 4

   II.      Statement of Facts ....................................................................................... 4

      A.      Leon Valley Court Procedures as of May 31, 2018 .................................. 5

      B.      Jack Miller's First Attempt to File a Complaint with the City of Leon Valley .................................................................................................... 5

      C.      Jack Miller's Second Attempt to File a Complaint with the City of Leon Valley .............................................................................................. 12

      D.      Salvaggio learns of Miller's Complaint and wants to send a message .................................................................................................................... 16

      E.       Leon Valley's False Police Reports .......................................................... 16

      F.      Search and Arrest Warrant Affidavits ...................................................... 19

      G.      The Midnight Raid .................................................................................... 20

      H.      Post-Raid .................................................................................................. 21

   III.     Scope of Review ....................................................................................... 21

      SUMMARY OF THE ARGUMENT ....................................................................... 23

ARGUMENT ....................................................................................................24

I.   Neither King, Salvaggio, Anderson, Saucedo, nor Wells Enjoy Qualified Immunity for the Securing and Execution of an Arrest and Search Warrant Lacking in Arguable Probable Cause Where Facts Material to Probable Cause Were Omitted and Misrepresented ...............24

   A.   King's Search Warrant Application was Devoid of Arguable Probable Cause .........................................................................28

   B.   King's Arrest Warrant Application was Devoid of Arguable Probable Cause .........................................................................30

      1.   King misrepresented that he relied on the Preliminary Investigation Report prepared by Officer Vasquez. ..........................................................30

         a.   Vasquez' report of Rivera's account of the May 31, 2018, encounter with Miller is unsubstantiated in the summary judgment record. .............................................31

         b.   Vasquez' report of Wells' account of the May 31, 2018, account with Miller is unsubstantiated in the summary record. .......34

         c.   Contrary to King's Assertions in the Affidavits, Appellee Officers Offered No Material Evidence that the Device Holstered on Miller's Person Was in Plain View. ...........................35

      2.   King withheld information from the magistrate that the information relied upon was stale and could not support probable cause. ..................37

II.   Salvaggio, Anderson, Saucedo, and Wells Retaliated against Miller because of His Status as a Citizen Journalist and Activist, and Because of His Activity in Filing a Complaint with the City of Leon Valley ....................................................................................................40

CONCLUSION .................................................................................................43

PRAYER ..........................................................................................................45

CERTIFICATE OF SERVICE........................................................................46

CERTIFICATE OF COMPLIANCE ..............................................................47

# TABLE OF AUTHORITIES

## Cases

*Allen v. Cisneros*,
  815 F.3d 239 (5th Cir. 2016) ................................................................. 41

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................... 45

*Batyukova v. Doege*,
  994 F.3d 717 (5th Cir. 2021) ............................................................... 21

*Boos v. Barry*,
  485 U.S. 312 (1988) ........................................................................... 42

*Boudreaux v. Swift Transp. Co., Inc.*,
  402 F.3d 536 (5th Cir. 2005) ............................................................... 44

City of Houston, Tex. v. Hill,
  482 U.S. 451 (1987) ........................................................................... 42

Cummings v. Bexar Cty.,
  2018 U.S. Dist. LEXIS 185417 (W.D. Tex. Oct. 30, 2018) ................................. 38

*Davidson v. City of Stafford, Tex.*,
  848 F.3d 384 (5th Cir. 2017) ............................................................... 41

*Floyd v. City of Kenner*,
  351 Fed. Appx. 890 (5th Cir. 2009) ........................................................ 25

*Franks v. Delaware*,
  438 U.S. 154 (1978) ..................................................................... 24, 25

*Garcia v. Orta*,
  47 F.4th 343 (5th Cir. 2022) ............................................................... 25

*Hale v. Fish*,
  899 F.2d 390 (5th Cir. 1990) ............................................................... 25

*Hartman v. Moore*,
  547 U.S. 250 (2006) ........................................................................... 41

Hawkins v. State,

535 S.W.2d 359 (Tex. Crim. App. 1976) .............................................. 38

*In re K. H.*,
   169 S.W.3d 459 (Tex. App.—Texarkana 2005) ................................... 7

*Joseph v. Bartlett*,
   981 F.3d 319 (5th Cir. 2020) ............................................................. 22

*Keenan v. Tejeda*,
   290 F.3d 252 (5th Cir. 2002) ............................................................. 41

*Ker v. State of California*,
   374 U.S. 23 (1963) ........................................................................... 39

*Kohler v. Englade*,
   470 F.3d 1104 (5th Cir. 2006) ........................................................... 25

*Minnesota v. Dickerson*,
   508 U.S. 366 (1993) ......................................................................... 38

*Morin v. Caire*,
   77 F.3d 116 (5th Cir. 1996) ............................................................... 25

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) ......................................................................... 44

*Terwilliger v. Reyna*,
   4 F.4th 270 (5th Cir. 2021) ............................................................... 24

*Tolan v. Cotton*,
   572 U.S. 650 (2014) ......................................................................... 44

*Turner v. Driver*,
   848 F.3d 678 (5th Cir. 2017) ............................................................. 42

*United States v. Allen*,
   625 F.3d 830 (5th Cir. 2010) ....................................................... 37, 38

*United States v. Craig*,
   861 F.2d 818 (5th Cir. 1988) ............................................................. 38

*United States v. Freeman*,
   685 F.2d 942 (5th Cir. 1982) ............................................................. 29

*United States v. Gallegos*,
   239 F. App'x 890 (5th Cir. 2007) ................................................................ 30, 37

*United States v. Garcia*,
   27 F.3d 1009 (5th Cir. 1994) ...................................................................29

*United States v. Leon*,
   468 U.S. 897 (1984) ................................................................................ 24, 29

*United States v. McKeever*,
   5 F.3d 863 (5th Cir. 1993) .....................................................................37

*United States v. Morton*,
   46 F.4th 331 (5th Cir. 2022) ...................................................................29

*United States v. Place*,
   462 U.S. 696 (1983) ...............................................................................39

*United States v. Ruelas*,
   761 F. App'x 366 (5th Cir. 2019) ..........................................................37

*United States v. Satterwhite*,
   980 F.2d 317 (5th Cir. 1992) ..................................................................29

*United States v. Sokolow*,
   490 U.S. 1 (1989) ...................................................................................38

*Valderas v. City of Lubbock*,
   937 F.3d 384 (5th Cir. 2019) ..................................................................22

*Winfrey v. Rogers*,
   901 F.3d 483 (5th Cir. 2018) ............................................................... 24, 25

*Zinter v. Salvaggio*,
   610 F.Supp. 3d, 919 (W.D. Tex. 2022) .................................................40

## Federal Constitutional Provisions

U.S. Const. amend. I ...........................................................................1, 43

U.S. Const. amend. IV .........................................................................1, 43

U.S. Const. amend. XIV .........................................................................1

**Federal Statutes**

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

42 U.S.C. § 1983 ..................................................................................1

**Federal Rules**

Fed. R. App. P. 4 .................................................................................1

**State Statutes**

TEX. GOV'T CODE § 411.209 .............................................................6

TEX. PENAL CODE § 30.06 ................................................... 5, 8, 10, 43

TEX. PENAL CODE § 30.07 ...................................................... passim

TEX. PENAL CODE § 46.01(3) .............................................................6

TEX. PENAL CODE § 46.03 ...................................................... passim

**Other Authorities**

TEX. ATT'Y GEN. OP. NO. KP-0047 (2015) .........................................43

## JURISDICTIONAL  STATEMENT

This case is brought pursuant to 42 U.S.C. § 1983, based on Plaintiffs-Appellants' claims for relief for civil rights violations under the First, Fourth, and Fourteenth Amendments of the United States Constitution.   The District Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the District Court issued an order resulting in entry of a final judgment which fully and finally disposed of all claims against all parties by granting summary judgment as to the claims of Defendants-Appellees against Plaintiffs-Appellants and denying partial summary judgment as to the claims of Plaintiffs-Appellants against Defendants-Appellees.

Plaintiffs-Appellants timely noticed this appeal on December 5, 2023.   Fed. R. App. P. 4.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in finding that Defendants Salvaggio, Anderson, Saucedo, Wells, Vasquez, Brooks, King, and Munoz are entitled to qualified immunity.

2.      Whether the district court erred in determining that the arrest warrant application established arguable probable cause.

3.      Whether the district court erred in determining that the search warrant application established arguable probable cause.

4.      Whether genuine disputes of fact exist that preclude qualified immunity at the summary judgment stage for Appellee Officers in relation to Appellants' First and Fourth Amendment unlawful search and seizure claims where the search and arrest warrants were not supported by probable cause but instead were sought in retaliation for Miller's filing of a complaint against the City of Leon Valley.

5.      Whether, if Appellee-Officers' falsities within the King Affidavit in support of the search warrant are removed and the omitted material facts are included in the affidavit, probable cause would not exist for the issuance of the search warrant for the Miller residence.

6.      Whether, if Appellee-Officers' falsities within the King Affidavit in support of the arrest warrant are removed and the omitted material facts are included in the affidavit, probable cause would not exist for the issuance of the arrest warrant

for Miller.

## STATEMENT OF THE CASE

### I.     Proceedings Below

Jack Miller is well-known to the local law enforcement community—and Chief Salvaggio—as a citizen journalist and police accountability activist. Following a no-knock, midnight raid on Jack Miller's and his family's residence to arrest Jack Miller for filing a complaint with Leon Valley earlier in the day and to search the residence for all hard drives, recording devices, and firearms; the Plaintiffs-Appellants filed a Complaint asserting violations of the First and Fourth Amendments. More specifically, Appellants alleged that the arrest of Jack Miller and the search of their home were the result of the execution of invalid search and arrest warrants sought and obtained by officer Alex King, with the assent and agreement of Chief Joseph Salvaggio, Captain Ruben Saucedo, Lieutenant David Anderson, and Detective Jim Wells.

Following extensive discovery, the parties each filed motions for summary judgment.[1] The district court denied Appellants' motion but granted Appellees'.[2] Appellants filed their notice of appeal on December 5, 2023.[3]

### II.     Statement of Facts

---

[1] ROA.823-38, 1162-1214.

[2] ROA.2892-2909.

[3] ROA.2922-23.

### A. Leon Valley Court Procedures as of May 31, 2018

Leon Valley's courtroom is in City Hall and is held on certain days. When court is in session, Leon Valley police set up a security table and wand people for prohibited items regardless of whether they are there for court or for some other purpose. If someone has a prohibited item, they are denied entry into the building but offered the opportunity to store the item(s) in a lockbox in the vestibule in between the lobby and the entrance doors.[4] Leon Valley police officers do not arrest or cite people attempting to make entry into the building with prohibited items. Further, Leon Valley did not provide public notice as to which parts of City Hall were considered areas essential to the courthouse (until June 14, 2018, which is after the incidents herein).

### B. Jack Miller's First Attempt to File a Complaint with the City of Leon Valley

Early in May of 2018, Jack Miller learned that the City of Leon Valley had affixed permanent signs to the entrance of City Hall, a *multi-use* municipal building, that prohibited the carrying of handguns by handgun license holders, under Sections 30.06 and 30.07 of the Texas Penal Code. Jack Miller knew that Texas law[5] explicitly prohibited Leon Valley from using or enforcing the Section 30.06 and

---

[4] ROA.1240-44, 1425-27.

[5] TEX. PENAL CODE § 30.06(e) (2017); TEX. PENAL CODE § 30.07(e) (2017).

30.07 signs, and that the signs themselves created a liability issue for Leon Valley.[6]

The law required Miller to file a complaint with the city itself before he could make

one with the Texas Attorney General.[7]  On May 31, 2018, that is what he did.

When Miller arrived at Leon Valley City Hall about 3:44 P.M., he had

attached to his hip a holstered training device incapable of firing or carrying

ammunition—a Ring's Blueguns FSG19 Glock 19/23/32 ("a fake device")[8]

spraypainted black as a prop.  He suspected that Leon Valley might not know their

signage was unlawful, so to keep this process safe, he did not want to file his

complaint with a real firearm.  He also wanted to be sure that he did not make any

argument for any officer to claim he was violating Section 46.03 of the Texas Penal

Code.

The 2017 version of the Texas Penal Code defined "firearm" as "any device

designed, made, or adapted to expel a projectile through a barrel by using energy

generated by an explosion or burning substance[.]"[9]  Carrying a device inconsistent

---

[6] TEX. GOV'T CODE § 411.209 (A city can be fined $1,000-$1,500 the first time they post these signs and $10,000-$10,500 for each subsequent offense. Each day of a continuing violation constitutes a separate violation.).

[7] TEX. GOV'T CODE § 411.209(d).

[8] ROA.564, 587, 2177.

[9] TEX. PENAL CODE § 46.01(3) (2017).

with this definition does not violate Section 46.03 of the Texas Penal Code.[10]  Even

though Miller knew that he was not carrying a firearm as it is statutorily defined, he

wanted to test whether Leon Valley would enforce the unlawful signs by detaining

him.  He was comforted in knowing they would quickly see the device was fake.  To

objectively capture the interaction, Miller (and a friend) came prepared to film[11] his

filing a formal complaint at City Hall.

When Miller entered into the multi-use building, he stood in line waiting to

approach Officer Rivera who was standing behind a table with a metal detection

wand screening people as they came in.[12]  Once he reached the front of the line,

Miller asked Rivera what was located in the building.[13]   Rivera informed him that

the building housed City Hall, the police department, the city manager's office,

animal control, and (after further inquiry) court.[14]   Upon confirming his

understanding that the building was a multi-use facility, Miller asked to speak with

someone to file a complaint regarding the improper posting of the Texas Penal Code §

_____

[10] *In re K. H.*, 169 S.W.3d 459, 464 (Tex. App.—Texarkana 2005, no pet.).

[11] ROA.1907, Exhibit 15 (3:03-3:12).

[12] ROA.2170, Exhibit 30.

[13] ROA.1889, Exhibit 7 (0:15-:51).

[14] ROA.1889, Exhibit 7 (0:15-:51).

30.06 and 30.07 signs.[15]   Rivera told Miller to give her a minute and she would be right with him.[16]   Miller stood to the side and waited,[17] while she signaled to Detective Wells to come forward to speak with him about filing his complaint.[18] Rivera never wanded, detained, or searched Jack Miller.  Nor did she ever ask about his fake device.

Once Wells approached Miller, they engaged in small talk as Miller informed Wells that the signs posted outside were illegal.[19]  He also told Wells that he intended to submit a complaint to the City and then to the Office of the Attorney General (OAG) if Leon Valley chose to leave them up.[20]  Wells informed Miller that he would not be taking his complaint[21] and ordered him to step outside where they could talk[22] as "no firearms were allowed" in the building.[23]  Wells did not detain or search

---

[15] ROA.1889, Exhibit 7 (0:15-0:51).

[16] ROA.1889, Exhibit 7 (0:52-1:10).

[17] ROA.1889, Exhibit 7 (0:52-1:10).

[18] ROA.1889, Exhibit 7 (1:21-1:40).

[19] ROA.1889, Exhibit 7 (1:39-2:06); 1562, 2174-77.

[20] ROA.1889, Exhibit 7 (1:39-2:06).

[21] ROA.1562.

[22] ROA.1562.

[23] ROA.1562.

Miller.  At this point, Miller was concerned about getting his complaint filed.

Once outside, Wells refused to take the signs down[24] and instructed Miller to contact the OAG's office;[25] Leon Valley would deal with them.[26] Wells wished Miller a good day[27] and walked down the front steps toward the parking lot.[28] Wells viewed Miller as "compliant" and cooperative.[29]

After Wells walked off, Miller turned around and saw Lieutenant Anderson standing in the door to the municipal building watching him.[30]  Anderson knew of Miller and did not like his activism.  Anderson had been informed by non-party Sergeant E. Gonzales of Miller's visit and was waiting for Wells to finish his conversation before "confront[ing] him out front[.]"[31]

Miller asked Anderson if he was an official willing to talk.[32]  Anderson agreed,

---

[24] ROA.1889, Exhibit 7 (2:55-3:00).

[25] ROA.1889, Exhibit 7 (2:55-3:00).

[26] ROA.1889, Exhibit 7 (2:55-3:00).

[27] ROA.1889, Exhibit 7 (3:08-3:25).

[28] ROA.1889, Exhibit 7 (3:08-3:25).

[29] ROA.1563.

[30] ROA.1889, Exhibit 7; 1570.

[31] ROA.1644.

[32] ROA.1889, Exhibit 7 (3:35-4:28).

and they both shook hands.[33]   When Miller wanted to discuss his complaint, Anderson told Miller that he was "allowed to practice [his] First Amendment right until [his] ears bleed."[34]   Miller informed Anderson that he was not interested in discussing First Amendment rights with him;[35] rather he was there to discuss the illegality of using the posted Texas Penal Code 30.06 and Texas Penal Code 30.07 signs to prohibit openly carried and concealed carried handguns inside the multi-use areas of City Hall.[36]  Anderson continually interrupted Miller, saying he would not argue the law with him[37] and he should contact the Attorney General's office.[38] Miller asked if Leon Valley could look at the law on its own when someone had the time.[39]  Anderson insisted that he believed Leon Valley was in compliance with the law[40] and that they were entitled to post the signs in question because the building

---

[33] ROA.1889, Exhibit 7 (3:35-4:28).

[34] ROA.1889, Exhibit 7 (3:30-3:32).

[35] ROA.1889, Exhibit 7 (3:32-4:28).

[36] ROA.1889, Exhibit 7 (3:32-4:28).

[37] ROA.1889, Exhibit 7 (3:32-4:28).

[38] ROA.1889, Exhibit 7 (3:32-4:28).

[39] ROA.1889, Exhibit 7 (3:32-4:28).

[40] ROA.1889, Exhibit 7 (3:32-4:28).

was also used as a courthouse.[41]  He then informed Miller that he would not give him a confrontation,[42] to have a good day,[43] and to not block the entrance to the Municipal Building.[44]   While Miller insisted he was not there to provoke a confrontation,[45] Anderson turned his back on him and walked into the building.[46] Anderson made no mention of Miller's fake device.  He did not detain or search him.

Anderson and Rivera huddled together with E. Gonzales and Sergeant Tacquard in the City Hall lobby to discuss what just happened.[47]  As Miller headed toward his car in the nearby parking lot to put away the fake device,[48] no one (i) offered Miller the use of a lockbox to store his "supposed gun;" (ii) acted as if he or she believed Miller to be an actual threat to security; (iii) escorted him away from the front doors of the building; (iv) conducted a *Terry* stop to determine if he had an

---

[41] ROA.1889, Exhibit 7 (3:32-4:28).

[42] ROA.1889, Exhibit 7 (3:32-4:28).

[43] ROA.1889, Exhibit 7 (3:32-4:28).

[44] ROA.1889, Exhibit 7 (3:32-4:28).

[45] ROA.1889, Exhibit 7 (3:32-4:28).

[46] ROA.1889, Exhibit 7 (3:32-4:28).

[47] ROA.1906, Exhibit 14 (3:48:35-3:50:38 PM).

[48] ROA.2170, Exhibit 30 (5:59-6:10).

actual gun;[49] (v) examined the "supposed gun" holstered at his waist; (vi) performed any other investigation; or (vii) arrested him on site—either at Rivera's table,[50] or in the sparsely populated parking lot.[51]

### C. Jack Miller's Second Attempt to File a Complaint with the City of Leon Valley

Miller placed his fake device in the glove compartment of his car[52] and then returned to the City Hall lobby to file his complaint.[53]  After re-entering the building at about 3:51 P.M,[54] Miller was wanded[55] for the first time by Rivera[56]who had continued performing security checks at the door.[57]  Once Rivera cleared him to enter the building, Miller approached the front desk to ask the receptionist for a complaint form.[58]

---

[49] ROA.1348.

[50] ROA.1348.

[51] ROA.1889, Exhibit 7 (4:28-4:31).

[52] ROA.2165-66.

[53] ROA.1905, Exhibit 13 (0:00-1:23).

[54] ROA.1906, Exhibit 14 (3:51:15 PM).

[55] ROA.1906, Exhibit 14 (3:51:15-3:51:56 PM).

[56] ROA.1905, Exhibit 13 (0:24-1:05).

[57] ROA.1906, Exhibit 14 (3:50:51-3:51:17 PM).

[58] ROA.1905, Exhibit 13 (1:14-1:28).

Six minutes after Miller entered the building for the second time, at about 3:57 P.M., while he was standing quietly filling out his complaint form at the front counter and politely chatting with the receptionist, he told his friend who was filming the event, that he had received a text message informing him that Anderson and his crew were already discussing potentially arresting him for entering the building with an alleged gun.[59]  At that time, Miller stated clearly to his friend, the Leon Valley receptionist, and Rivera[60] that if they arrested him and searched his vehicle, they would discover that his so-called weapon was really a rubber device.[61]

While Miller filmed himself completing his complaint form, at about 4:01 P.M, Officer Brooks meandered into the lobby and took up a position against the side counter of the receptionist's desk.[62]  The receptionist left shortly afterwards, and the desk remained unmanned for the duration of Miller's visit.  Five minutes later, at about 4:06 P.M., Brooks left the lobby and returned about 4:10 P.M. with a body camera which he set up on a nearby tabletop, focused on Miller.[63]  He was then joined at the front counter by Anderson who asked him if they had been able to

---

[59] ROA.1902, Exhibit 10 (5:44-6:03).

[60] ROA.1902, Exhibit 10 (6:03-6:20).

[61] ROA.1902, Exhibit 10 (6:03-6:20).

[62] ROA.1906, Exhibit 14 (4:01:15-4:06:38 PM).

[63] ROA.1906, Exhibit 14 (4:06:38-4:10:23 PM); 1907, Exhibit 15 (0:00-1:33).

identify Miller, yet.[64]  Brooks told Anderson that they were looking him up right then, but he knew that Miller was "included on the sheet."[65]

Miller confronted the two officers and asked them, "Are you guys out here for this?" referring to his complaint form.[66]  Anderson rudely interrupted Miller, telling him to, "Go ahead and try to solicit your confrontation.  Go ahead."[67]  When Miller responded that he usually did not get a problem from the police, Anderson denied giving him a problem and insisted he was there to take his complaint.[68]  When Miller pointed out that Anderson had been confrontational from the very beginning,[69] Anderson interrupted him again and demanded he tell him his complaint, because he was a busy man.[70]  Miller suggested that if Anderson was too busy he would find someone else to help him.[71]  Anderson claimed he would handle it, but then

---

[64] ROA.1907, Exhibit 15 (2:11-2:32).

[65] ROA.1907, Exhibit 15 (2:32-2:35).

[66] ROA.1907, Exhibit 15 (2:50-2:57).

[67] ROA.1907, Exhibit 15 (3:11-3:16).

[68] ROA.1903, Exhibit 11 (0:00-0:13); 1907, Exhibit 15 (3:17 -3:30).

[69] ROA.1903, Exhibit 11 (0:14-0:20); 1907, Exhibit 15 (3:33-3:36).

[70] ROA.1903, Exhibit 11 (0:14-0:20); 1907, Exhibit 15 (3:36-3:44).

[71] ROA.1903, Exhibit 11 (0:14-0:20); 1907, Exhibit 15 (3:36-3:44).

immediately interjected, "I'm not going to give you a confrontation. Promise,"[72] and started to turn away.[73]  When Miller asked him to stop, Anderson told him that he had his complaint, grabbed the filled-out form from off the counter, and walked away.[74]  Miller insisted that Anderson return his form; he would find another officer to discuss it with

Miller then tried to discuss his complaint form with Captain Saucedo who was present in the front hall.  Saucedo informed Miller that Anderson usually handles these matters, but after Miller explained that he had tried to talk with Anderson and he had been confrontational and little help, Saucedo pulled Miller to the side, away from the people waiting by the courtroom to discuss his concerns.[75]  Saucedo and Miller shook hands twice during this conversation.[76]  After taking pictures with his phone of his filled-out complaint form, Miller gave Saucedo the form and offered to do a follow-up video hopefully showing Leon Valley in a positive light.[77]  Miller

---

[72] ROA.1907, Exhibit 15 (3:43-3:55).

[73] ROA.1903, Exhibit 11 (0:29-0:33); 1907, Exhibit 15 (3:43-3:55).

[74] ROA.1907, Exhibit 15 (3:55-3:59).

[75] ROA.1903, Exhibit 11 (1:33-5:00).

[76] ROA.1903, Exhibit 11 (1:33-6:10).

[77] ROA.1903, Exhibit 11 (5:06-5:54).

then left City Hall believing that the incident had come to a close.[78]  He was not detained, arrested, or followed.

### D. Salvaggio learns of Miller's Complaint and wants to send a message

Anderson informed Chief Salvaggio about Miller's visit.  Salvaggio held a meeting with Saucedo, Anderson, Wells, and Gonzales, and explained that, because Miller was a "First Amendment and Second Amendment auditor,"[79] he needed to be treated differently.  Salvaggio wanted to send a message to Jack Miller that he was not untouchable and that his activism was not welcomed in Leon Valley.  Salvaggio directed his Officers[80] to charge Miller with the felony offense, "Places Weapons Prohibited,"[81] and prepare affidavits in support of acquiring a warrant to arrest him and raid his home later that evening.[82]

### E. Leon Valley's False Police Reports

Close to an hour after Miller left the Leon Valley multi-use Municipal Building, E. Gonzales, at the direction of Salvaggio, Saucedo, and Anderson,

---

[78] ROA.1907, Exhibit 15 (9:27-9:46).

[79] ROA.1640-41, 1646-49, 1780-82, 1806-17, 1925:25-27:9, 1967:7-68:2, 1968:13-23, 1982-84, 1987-93, 2023:22-25:1, 2027-2033, 2067-71, 2073-74.

[80] ROA.1474-75.

[81] TEX. PENAL CODE § 46.03.

[82] ROA.2024.

ordered Defendant-Appellee Vasquez, who was not present during the encounter with Miller and therefore had not observed any of the events that afternoon, to speak with Rivera about what she had witnessed and write a police incident report against Miller for a charge of Places Weapons Prohibited under Texas Penal Code § 46.03.[83]

However, Rivera testified during deposition that she was almost sure she had written a police report that day,[84] she was not consulted in the writing of any report,[85] did not ever "advise Tacquard" as stated in his affidavit, that "a member of the Audit group [was] in the building,"[86] did not herself "prepare the narrative"[87] for the "supplement" she allegedly submitted, [88] and was not "asked at any point to write an affidavit for the search warrant."[89]  Moreover, on May 31, 2018, Rivera was not "of the understanding that being a member of an Auditor group was against the law."[90] She testified that she "[was not] aware that Leon Valley police officers were

---

[83] ROA.1295, 1470, 2076-78.

[84] ROA.1401.

[85] ROA.1413-14.

[86] ROA.1424-25, 1429, 1432.

[87] ROA.1404.

[88] ROA.1405.

[89] ROA.1427.

[90] ROA.1430.

intending to obtain a search and arrest warrant that night against Jack Miller."[91]  She left work late after 5:00 P.M.,[92] well before the warrant was signed by the magistrate judge around 10.30 P.M.[93]

Anderson later claimed in his police report[94] that he made the decision to allow Miller to fill out a complaint form and leave, without stopping him or even initiating an arrest for supposedly bringing a gun onto the premises, because "his activist and affiliates are known to cause major confrontations when arrest is imminent and drastically overreact and even resist arrest in order to capture the video and post it on social media platforms."[95] "[I]t was determined that an arrest warrant would be obtained . . . instead of an on sight [sic] arrest and risking injuries or possible social media inspired disturbances."[96]

Defendant-Appellee King testified that his Sergeant, E. "Gonzales came to him [between 5:00 and 6:00 P.M."][97] and told him that Chief [Salvaggio] wants us

---

[91] ROA.1432-33.

[92] ROA.1400-04.

[93] ROA.1280.

[94] ROA.1909-10.

[95] ROA.1641.

[96] ROA.1676.

[97] ROA.1474-75.

to do a search warrant and arrest warrant for Jack Miller."[98]  Although King was the Officer assigned to write the affidavit, after reading the preliminary investigation report "prepared" by Vasquez,[99] he testified that E. Gonzales wrote the affidavit for him to review, sign, and submit[100] after having discussions that day with Chief Salvaggio.[101]

### F.  Search and Arrest Warrant Affidavits

The affidavits, littered with different fonts, purportedly written by King and Gonzales, but approved by Anderson, Saucedo, and Salvaggio ("King Affidavits"), indicate that the information provided in the affidavit came from Rivera.  This contradicts Rivera's testimony when she indicates she went home at 5:00 P.M. without speaking with anyone, without drafting any report, and unaware of the raid. King was not asked to draft the affidavit until after 5:00 P.M.

Both affidavits falsely claimed that Miller was stopped in the lobby with a "clearly visible" and holstered firearm.[102]  Both affidavits omitted material information that no one detained or searched Jack Miller, and that they allowed Jack

---

[98] ROA.1473.

[99] ROA.1475-76.

[100] ROA.1476.

[101] ROA. 1473, 1478-79, 1486, 1547, 1816-17, 1832.

[102] ROA.2081, 2151.

Miller to leave the area effectively making any purported reasonable suspicion they might have had go stale. The affidavits also failed to provide any information that would support any probable cause finding that evidence of a crime would be found at Appellants' residence.

The affidavits do not provide any actual investigative information, including that Jack Miller was a licensed handgun holder and did not have any warrants or criminal record. Instead, the affidavits focused on how a bulletin describes Jack Miller as someone who "provokes" law enforcement[103] followed by generic assumptions from Tacquard, Wells, and Anderson that Miller was at City Hall to "audit" and provoke a response.[104]

### G. The Midnight Raid

The King Affidavits, approved by Salvaggio, Saucedo, and Anderson, were signed off by a magistrate at around 10:30 P.M.[105] At around 1:30 A.M., June 1, 2018, Salvaggio, Saucedo, Anderson, Brooks, Gonzales, Tacquard, and King all made no-knock entry into the Miller residence without any body worn cameras.[106] Many of the officers swept their home with firearms holding Miller, Campbell,

---

[103] ROA.2070.

[104] ROA.2081-82, 2151-52.

[105] ROA.2082, 2152.

[106] ROA.1228-29, 1577, 1803.

Miller's children, and grandchildren at gunpoint.[107]  Miller was handcuffed before Salvaggio confronted him laughing and thanking him for visiting Leon Valley.[108]

The officers took items not included in the search warrant including a rifle, silver and black handguns, firearm accessories, a tripod, cables, the Wi-Fi router, a webcam, and a dashcam.[109]  They also destroyed a television and handmade lamp.[110] While Miller's vehicle was searched, to include the glove box, the officers did not take his fake device.  The items seized were never properly inventoried and chain of custody was not maintained.

### H. Post-Raid

Jack Miller was in jail for hours.[111]  Prosecution terminated in Jack Miller's favor after the prosecutors agreed that they lacked sufficient evidence.[112]

### III.   Scope of Review

A district court's grant of summary judgment is reviewed *de novo*.  *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021).  Facts are viewed in the light most

---

[107] ROA.2156-57, 2159-60, 2162-63.

[108] ROA.1324:11-14.

[109] ROA.589.

[110] ROA.590.

[111] ROA.1115 (87:14-16).

[112] ROA.1109 (64:1-11), 2517-18.

favorable to the nonmoving party and all reasonable inferences are drawn in that party's favor. *Joseph v. Bartlett*, 981 F.3d 319, 325 (5th Cir. 2020). But greater weight is given "to the facts evident from video recordings." *Valderas v. City of Lubbock*, 937 F.3d 384, 388 (5th Cir. 2019).

## SUMMARY OF THE ARGUMENT

King's search and arrest warrants were secured and executed with the agreement and participation of Salvaggio, Anderson, Saucedo, and Wells. Considering the myriad misrepresentations and omissions of material facts made within the warrant applications, the warrants were devoid of arguable probable cause. Neither King, Salvaggio, Anderson, Saucedo, nor Wells enjoy qualified immunity under such circumstances. The false and retaliatory arrest and prosecution of Jack Miller, and the unlawful entry into Jack Miller's and Annabel Campbell's residence, and unlawful search of the residence were without probable cause, which violates clearly established rights.

# ARGUMENT

## I.     Neither King, Salvaggio, Anderson, Saucedo, nor Wells Enjoy Qualified Immunity for the Securing and Execution of an Arrest and Search Warrant Lacking in Arguable Probable Cause Where Facts Material to Probable Cause Were Omitted and Misrepresented

The Fourth Amendment right to be free from arrest without probable cause is clearly established." *Terwilliger v. Reyna*, 4 F.4th 270, 285 (5th Cir. 2021).  The Fourth Amendment right to be free from search or seizure without a good faith showing of probable cause is also clearly established.  *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018).

The Supreme Court's holding in *United States v. Leon*, 468 U.S. 897 (1984) sets the standard for determining the validity of a warrant and also provides the contours of liability in this Section 1983 action.  A warrant is invalid if:

> the magistrate or judge in issuing a warrant was mislead by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware*, 438 U.S. 154 (1978). . . . Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part).

*Leon*, 468 U.S. at 923.

"[W]hen the Fourth Amendment demands a factual showing sufficient to comprise probable cause, the obvious assumption is that there will be a truthful showing." *Franks v. Delaware*, 438 U.S. 154, 165 (1978).  A warrant is invalid

24

when (1) an officer's warrant application contains information that is deliberately false or which was included with reckless disregard for the truth and (2) the warrant would not support a finding of probable cause without that information. *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018) (quoting *Franks*, 438 U.S. at 155-56). As a result, qualified immunity will not shield officers from liability for false statements or omissions if they were necessary to the finding of probable cause. *Garcia v. Orta*, 47 F.4th 343, 352 (5th Cir. 2022).

"In order to constitute a constitutional violation sufficient to overcome the qualified immunity of an arresting officer, the material misstatements and omissions in the warrant affidavit must be of 'such character that no reasonable official would have submitted it to a magistrate.'" *Morin v. Caire*, 77 F.3d 116, 122 (5th Cir. 1996) (quoting *Hale v. Fish*, 899 F.2d 390, 402 (5th Cir. 1990)). Likewise, "the intentional or reckless omission of material facts from a warrant application" also violates the Fourth Amendment. *Floyd v. City of Kenner*, 351 Fed. Appx. 890, 895 (5th Cir. 2009) (quoting *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006)).

In summary, an officer should not receive qualified immunity if a reasonable officer should have known that the statements in the affidavit were included with reckless disregard for the truth or the facts were recklessly omitted from the affidavit supporting probable cause.

Here, the district court narrowly examined whether there was any reckless

disregard for the truth with respect to whether Miller possessed a real or fake gun. There was not any evaluation into (1) the officers failing to timely act to confirm or dispel reasonable suspicion, (2) the staleness of information providing reasonable suspicion to maybe briefly detain Miller, (3) or other material information, including the fact that Miller cleared the security check, (4) declared in the lobby that the device was rubber, and (5) none of the officers followed or observed Miller after he left City Hall.

Salvaggio wanted his officers to prepare search and arrest warrants against Miller with the intent of raiding Miller's home and arresting him later that evening because of his status as a citizen journalist and activist.[113]  To that end, Vasquez, who had no firsthand knowledge of the day's events was ordered to complete the department's primary investigative report used as probable cause for the affidavits in support of issuing the warrants.[114] Vasquez, consequently, could not rely on his own suspicions, beliefs, facts, or even knowledge of the circumstances he attested to witnessing in his report of the alleged crime.[115]  He necessarily relied on the

---

[113] ROA.1473.

[114] ROA.2081-82.

[115] ROA.1891-94, 1896-1901.

purported accounts of Officers Rivera,[116] Wells,[117] Tacquard,[118] and Anderson[119] (although it is unclear whether they authored these accounts on their own, and when they did so). He obviously was in no position to verify the rendition of events presented by these other officers.

Subsequently, King was ordered by E. Gonzales, at Salvaggio's direction[120] to "review," adopt and sign the affidavits that Gonzales had drafted based on Vasquez's investigative report.[121] King testified in deposition that "[he was] in the back office . . . filing cases . . . at the time Jack Miller was present in the area . . . and wasn't involved in any of the activity out in the lobby," on May 31, 2018.[122] King explained, "Sergeant Gonzales came [to him] and said, 'Hey, I typed it up, most of it. I need you to review it, and then when you think it's good, everything . . . you feel is comfortable with me, go ahead and sign it.'"[123]

---

[116] ROA.2081-82.

[117] ROA.2081-82.

[118] ROA.2081-82.

[119] ROA.2081-82.

[120] ROA.1473, 2024.

[121] ROA.1471.

[122] ROA.1469.

[123] ROA.1476.

Whether intentionally or because of reckless disregard for the truth Vasquez' investigative report as incorporated by E. Gonzales,[124] Salvaggio, Anderson, Wells, and Saucedo into the Affidavits for the search and arrest warrants and then adopted and signed by King as Affiant[125] was replete with mischaracterizations about the events that transpired between parties on May 31, 2018.

The district court disregarded the fact that Salvaggio directed his subordinate officers to present probable cause affidavits to a magistrate despite actual knowledge that the critical sworn facts were false and would lead to Miller's wrongful arrest.

A jury, viewing the evidence in the light most favorable to the plaintiffs, would conclude that King, Salvaggio, Anderson, Saucedo, and Wells included statements in the affidavits with reckless disregard for their truth and that facts material to the existence of probable cause were omitted from the affidavits in support of probable cause.

## A. King's Search Warrant Application was Devoid of Arguable Probable Cause

King misrepresented his "belief" that Miller's home and vehicle "contains items constituting evidence that the offense of Place weapons prohibited, in violation of section 46.03 of the Penal Code of the State of Texas, has been committed."[126]

---

[124] ROA.1471.

[125] ROA.1472.

[126] ROA.2151.

King, as the affiant, but obviously taking direction from Salvaggio, Anderson, Saucedo, and Wells, made conclusory statements that showed some nexus between Miller's house and the evidence sought. King claimed the house would contain evidence, but he did not provide any statements linking the purported evidence to the Miller residence.

"Reliance on a warrant is unreasonable," and thus not in good faith, when "the warrant is based on an affidavit so lacking in probable cause as to render belief in its existence unreasonable." *United States v. Morton*, 46 F.4th 331, 336 (5th Cir. 2022) (citing *Leon*, 468 U.S. at 897). Such "'[b]are bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Id*. (quoting *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992)) (internal quotation marks omitted).

"The affidavit must tend to show some nexus between the house to be searched and the evidence sought." *United States v. Garcia*, 27 F.3d 1009, 1014 (5th Cir. 1994) (citing *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982)). This nexus "may be established either through direct observation or through normal inferences as to where the articles sought would be located." *Id*. (quoting *Freeman*, 685 F.2d at 949) (internal quotation marks omitted).

Here, King fails to establish, through direct observation or normal inferences, that would establish probable cause justifying a search of the Miller residence and

vehicle—other than his sworn, conclusory "belief" which he later admitted he did not author as he was just following orders.[127]  Moreover, the affidavit disregarded, ignored, or otherwise omitted exculpatory facts that Miller re-entered City Hall, passed security, and was not detained or searched.  It also omits that none of the officers followed Miller once he left City Hall, or that hours passed between his time at City Hall and the time they started observing his residence.  These omissions were critical because it would have established that the officers were acting on stale information, which cannot support probable cause.  *United States v. Gallegos*, 239 F. App'x 890, 896 (5th Cir. 2007).

### B. King's Arrest Warrant Application was Devoid of Arguable Probable Cause

### 1. King misrepresented that he relied on the Preliminary Investigation Report prepared by Officer Vasquez.

According to the affidavit, King appeared to rely solely on the facts presented by Vasquez.  There are two issues with this.  First, King did not indicate what he did to confirm the hearsay within hearsay littered throughout Vasquez's report.  Second, he did not disclose that the affidavit was carefully drafted, reviewed, and edited by Gonzales, Salvaggio, Anderson, and Wells.  Each of these officers knew that no one

---

[127] ROA.1471.

had spoken to Rivera—this according to her own testimony.[128]    Yet, they relied
heavily on this hearsay within hearsay to effectively commit perjury to represent
with certainty that Jack Miller came into a prohibited place with an actual firearm.
There was no discussion in the affidavit about how Salvaggio and Anderson wanted
to use this innocent interaction to go after Miller in retaliation for his First
Amendment activities.

 King had different camera angles available to him.  He could have also
spoken with the officers that had stuck around the police department that night to
work on preparing this raid, as Salvaggio had ordered.  Had he done so, he would
have known that the representations of Miller displaying a firearm in "plain view"
were a reckless disregard for the truth.

> ### a.    Vasquez' report of Rivera's account of the May 31, 2018, encounter with Miller is unsubstantiated in the summary judgment record.

Rivera testified at deposition that in her supplement she reported that "Miller
was carrying a black semi-auto handgun in a holster on the right side of his waist."[129]
She was not certain she did this supplement *before* the execution of the warrants.[130]

 Yet, Rivera also testified at deposition that as the security officer on duty on

---

[128] ROA.1413-14.

[129] ROA.1410-11.

[130] ROA.1401:5-14.

May 31, 2018, she "(i) did not wand Miller to detect if he had a firearm on his body;[131] (ii) she did not recall wanding Miller;[132] (iii) she stated that "if he did have a Glock on his hip and [she] wanded him, it would have triggered the wand;"[133] (iv) "[she] did not investigate the device on [Miller's] hip;"[134] (v) "at no point did [she] inspect the device;"[135] she did not "detain" Miller;[136] and (vi) she did not "arrest" Miller when he approached her at the security desk at the front of the municipal building;"[137] because (vii) "[she] didn't feel like detaining him at that point was necessary."[138]

Rivera testified that she "believed (viii) 'the best person to have the most information about Jack Miller allegedly coming into the courtroom with a firearm' would have been Detective Wells;"[139] (ix) because " [she knew Detective Wells] at

---

[131] ROA.1408, 1423, 1445.

[132] ROA.1423, 1445.

[133] ROA.1445.

[134] ROA.1444-45.

[135] ROA.1423.

[136] ROA.1408-09.

[137] ROA.1409.

[138] ROA.1409.

[139] ROA.1427.

the moment that [she] asked for his assistance… remained with Jack Miller, walked him outside, spoke to him."[140] (x) "Detective Wells did speak to [Miller] outside;"[141] (xi) she "got [Miller] the detective, and he walked out with the detective;"[142] (xii) "[t]here was no incident at that point;"[143] (xiii) "there was nothing really occurring."[144]

Rivera further testified that: (x) she did not recall having any discussions with Detective Wells as to whether or not Jack Miller actually had a firearm;[145] (xi) she did not recall having any discussions with any officer about whether or not Jack Miller had a firearm;[146] (xii) she did not recall speaking with Officer Vasquez before he wrote the incident report for this case.[147]

Moreover, Rivera testified at deposition that she: (xiii) "was unaware that Leon Valley police officers were intending to obtain a search and arrest warrant that

---

[140] ROA.1427.

[141] ROA.1409.

[142] ROA.1420.

[143] ROA.1420.

[144] ROA.1420.

[145] ROA.1428.

[146] ROA.1428.

[147] ROA.1413.

night against Jack Miller,"[148] (xiv) she was "never asked to provide any affidavits in support of any arrest or search warrant;"[149] (xv) she [did not] think [she was] asked at any point to write an affidavit for a search warrant."[150]

> **b.    Vasquez' report of Wells' account of the May 31, 2018, account with Miller is unsubstantiated in the summary record.**

Wells testified at deposition that: (i) when he "walked out of [his] office" on May 31, 2018, . . . there was an adult male standing at the end of that hallway waving at [him];"[151]  and "[he] could obviously see that he had a handgun on his side in a holster"[152]

Yet, Wells also testified at deposition that;  (i) "the only part of the gun [he] could see was the top of the gun, the top of the slide, and the grips;"[153] (ii) "it resembled . . . a Glock;" [154] (iii) "[he] did not know what caliber;"[155] (iv) "it was a

---

[148] ROA.1432-33.

[149] ROA.1433.

[150] ROA.1427.

[151] ROA.1561.

[152] ROA.1561.

[153] ROA.1566.

[154] ROA.1566.

[155] ROA.1566.

dark-colored gun;"[156] (v) as "[he] escorted [Miller] outside. . . [he] told him 'you're going to have to stay out here with the thing.'"[157] (vi) at the time that "[he] typed up the initial body of [his supplement] . . .it was fresh on [his] mind;"[158] (vii) "[he] never said anything about a Glock;"[159] (viii) "[he] never asked Miller about the firearm [or] what kind of firearm it was."[160]

Wells also testified at deposition that (ix) "[i]f he was going to [arrest Miller] [he'd] have done it right then and there;"[161] (x) "[he] probably wouldn't have arrested [Miller];"[162] (xi) "because [Miller] cooperated (xii) "[Miller] [w]alked outside;"[163] (xiii) Wells "had no more business with him [and] walked away."[164]

   c.    **Contrary to King's Assertions in the Affidavits, Appellee Officers Offered No Material Evidence that the Device Holstered on Miller's Person Was in Plain View.**

---

[156] ROA.1566.

[157] ROA.1569.

[158] ROA.1584.

[159] ROA.1574.

[160] ROA.1574.

[161] ROA.1584.

[162] ROA.1584.

[163] ROA.1586-87.

[164] ROA.1587.

Contrary to King's assertions in the Affidavits, Appellee Officers offered no material evidence that the device holstered on Miller's hip was a firearm, or that it was in *plain view*. In fact, in *Defendants Chief Joseph Salvaggio, Et Al's Reply In Support Of Its Motion For Summary Judgment*[165] Appellee Officers admit that "[they] may never know whether it was a real Glock or a disguised Glock."[166]

This admission by Appellee Officers is corroborated by video evidence, which undisputedly shows the device at issue was always partially hidden by the holster it rested in on Miller's hip while he stood standing in the non-judicial security area of the multi-use facility.[167] The device, was never drawn out of the holster and, thus, never fully visible.[168] None of the police reports or affidavits identify the type of alleged "firearm" that Jack Miller had holstered, other than describing it as a "*black* semi-automatic handgun."[169] Only recently during deposition did some officers start classifying the device as a "Glock." These defendants likely changed their narrative once they learned that a *silver*-looking Glock was recovered from Jack Miller's

---

[165] ROA.2871-78.

[166] ROA.2875.

[167] ROA.2173-77.

[168] ROA.2173-77.

[169] ROA.2076-78.

36

residence.[170] However, Rivera, who was responsible for processing the evidence seized during the raid on Miller's house, testified at deposition that the recovered *silver*-looking Glock was not what she saw Jack Miller with on the day in question."[171]

**2.    King withheld information from the magistrate that the information relied upon was stale and could not support probable cause.**

King, Salvaggio, Anderson, Saucedo, and Wells knew that the affidavit omitted material information that the information they relied on was stale and could not support probable cause. *See United States v. Gallegos*, 239 F. App'x 890, 896 (5th Cir. 2007) ("Stale information in an affidavit cannot support probable cause."). Instead, "[t]he proof must be of facts closely related in time to the issuance of the warrant in order to justify a finding of probable cause at that time." *Id*. (quoting *United States v. McKeever*, 5 F.3d 863, 866 (5th Cir. 1993)) (internal quotation marks omitted). Whether a delay renders information stale "depends on the facts of the case, including the nature of the criminal activity and the type of information." *United States v. Ruelas*, 761 F. App'x 366, 370 (5th Cir. 2019) (citing *United States v. Allen*, 625 F.3d 830, 842 (5th Cir. 2010)).

To determine whether information is stale, courts consider: "(1) whether there

---

[170] ROA.1740.

[171] ROA.1445.

existed a longstanding pattern of criminal activity, and (2) whether the evidence in question 'is of the sort that can reasonably be expected to be kept for long periods of time in the place to be searched.'" *Id*. (quoting *United States v. Craig*, 861 F.2d 818, 822-23 (5th Cir. 1988)).

Miller concedes that while he was at City Hall, the officers could have conducted a *Terry* stop or brief detention based on reasonable suspicion. Afterall, the key component to a weapons prohibited offense is *possession*. *Cummings v. Bexar Cty*., 2018 U.S. Dist. LEXIS 185417, *18 (W.D. Tex. Oct. 30, 2018). "[T]he offense of possession of a prohibited weapon [is] complete" when a person is "placed in possession of the prohibited weapon." *Hawkins v. State*, 535 S.W.2d 359, 362 (Tex. Crim. App. 1976). The requisite level of suspicion is less than probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

However, the officers here took *no* action to confirm or dispel reasonable suspicion as to whether Miller actually *possessed* a prohibited item. They had many options available, beyond a temporary detention. Officers could have conducted a warrantless "protective search" to look for weapons that might be used to harm the officer. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). An officer may even detain an item, if the officer has reasonable suspicion to believe that it contains a weapon, contraband, or other evidence of a crime and the "exigencies of the circumstances demand it or some other recognized exception to the warrant

38

requirement is present." *United States v. Place*, 462 U.S. 696, 708-09 (1983).  A warrantless search or seizure may also be conducted to preserve evidence when it is at immediate risk of removal or destruction.  *Ker v. State of California*, 374 U.S. 23, 40-42 (1963) (warrantless seizure of marijuana supported by reasonable belief drug could be easily destroyed or hidden).

Again, these officers *did nothing*.  Yet, they suggest that their inaction, as a matter of law, elevates to probable cause.  This cannot be so.

There is no question that the officers did not know with any certainty whether Jack Miller *possessed* a *firearm* (as statutorily defined) in a prohibited place.  However, once the officers allowed Jack Miller to leave City Hall and drive away without confirming or dispelling reasonable suspicion, the information, objectively, went stale as the officers could *never* establish whether Jack Miller actually *possessed* a firearm in a prohibited place.  It did not matter if they found him with every firearm ever produced.

The Appellee officers omitted their inaction from the affidavit to mislead the magistrate intentionally or recklessly.  The officers also omitted reference to the fact that Miller went back into City Hall, cleared security, and held conversations with the officers, and no one detained or seized him (at any point—either inside or out).  None of the officers questioned Miller about the fake device, although he declared on video that it was rubber.

It was only after Salvaggio learned that Miller, someone he knew as an activist, was engaging in journalism, activism, and filing a complaint in Leon Valley, did he direct his officers to pursue the false arrest and charges to retaliate against Miller.

## II. Salvaggio, Anderson, Saucedo, and Wells Retaliated against Miller because of His Status as a Citizen Journalist and Activist, and Because of His Activity in Filing a Complaint with the City of Leon Valley

Salvaggio admitted that he, Saucedo, Anderson, and Wells knew of Jack Miller prior to May 31, 2018, and that he viewed him as a "First and Second Amendment Auditor."[172] With this classification, Jack Miller is a criminal according to Salvaggio. Salvaggio stated that concerning "auditors . . . whether some are good or bad, it's not relevant."[173] Salvaggio concluded that it was not relevant whether Jack Miller went to City Hall with a real firearm.[174] He was going to use that visit to "show up at Jack Miller's house in the middle of the night and smirk at him."[175] This is because Salvaggio sees Miller as a liar and a criminal that "gets away with a lot of stuff."[176] Salvaggio completely intended to use this incident to go after Jack

---

[172] ROA.1301-03, 1359.

[173] *Zinter v. Salvaggio*, 610 F.Supp. 3d, 919, 957 (W.D. Tex. 2022) (quoting sworn testimony of Salvaggio describing Jack Miller and others).

[174] ROA.1321-22.

[175] ROA.1260.

[176] ROA.1223.

Miller by holding him and his family hostage, arresting him, charging him with false crimes, and taking all of his firearms, hard drives, and cameras to chill his First Amendment rights and to injure him.

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim. *Id*. In retaliatory prosecution claims, plaintiffs must plead and prove the absence of probable cause for the underlying criminal charge. *Id*. at 265–266.

It is clearly established that an arrest or prosecution unsupported by probable cause that is made in retaliation for protected speech violates the First Amendment. *See Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 391 (5th Cir. 2017), as revised (Mar. 31, 2017) (citing *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016)) (individuals who protest are protected under the First Amendment from retaliatory actions by government officials); *Keenan v. Tejeda*, 290 F.3d 252, 260 (5th Cir. 2002) (retaliatory criminal prosecutions may constitute actionable First Amendment violation). *See also Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("the law is settled that as a general matter the First Amendment prohibits government officials from

41

subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out").

Miller already contends above that a jury would conclude that the officers lacked probable cause to arrest him, search his house, or seek prosecution. The summary judgment record further establishes that Miller was targeted for arrest once the officers realized his status as an activist and citizen journalist, and because he filed a complaint against the City of Leon Valley asserting that it was violating state law. A jury could therefore conclude that Miller would not have been arrested, had his home searched, or subjected to prosecution had the officers not viewed him as a citizen journalist or activist.

Miller's activism while filming himself filing complaints is protected by the First Amendment. *Turner v. Driver*, 848 F.3d 678, 689 (5th Cir. 2017). Individuals in this country have the freedom "to oppose or challenge police action without thereby risking arrest." *City of Houston, Tex. v. Hill,* 482 U.S. 451, 462-63 (1987). In addition, "[p]olitical protest is 'classically political speech' which operates at the core of the First Amendment."[177] Plaintiff Appellant Miller was engaged in First Amendment protected political and symbolic speech at the Leon Valley multi-use Municipal Building on May 31, 2018, when he peacefully protested and complained

---

[177] *Boos v. Barry*, 485 U.S. 312, 318 (1988).

of the unlawful signage and filmed himself writing out and filing the complaint.

## CONCLUSION

Miller's First Amendment claims in Counts I and II, and Fourth Amendment claims in Counts III, and IV herein are clearly established by video evidence, leaving genuine issues of material fact warranting a dismissal of Defendants-Appellees' Motion for Summary Judgment.

Miller was engaged in First Amendment protected political and symbolic speech at the Leon Valley multi-use Municipal Building on May 31, 2018. The First Amendment protected his right to file a grievance against the City of Leon Valley and its police department for improperly posting Texas Penal Code § 30.06 and Texas Penal Code § 30.07 signage at the entrance to its *multi-use* Municipal Building to prohibit openly carried and concealed carried handguns inside the building and informing the police department that the State Attorney General, at the time, had rendered an opinion, that the phrase "premises of a government court or office utilized by the court" under TEX. PENAL CODE 46.03 Places Weapons Prohibited meant a government courtroom or those offices *essential to the operation of the government court* (emphasis added),[178] and not the public service centers located in the *multi-use* sections of the Municipal building.

---

[178] TEX. ATT'Y GEN. OP. NO. KP-0047 (2015).

The summary judgement record shows there are genuine disputes as to the material facts in this case, and particularly with respect to Appellee Officers (i) intentionally or with reckless regard for the truth using false information, misrepresentations and intentional omissions as probable cause in their affidavits to obtain search and arrest warrants from the magistrate judge; (ii) unlawfully arrest Plaintiff-Appellants for Miller exercising his First Amendment right to engage in political and symbolic speech; (iii) unlawfully search Plaintiff-Appellants' home; (iv) unlawfully exceed the scope of the illegally obtained search warrant; (v) unlawfully arrest Miller and his family in retaliation for Miller exercising his constitutional right to file a grievance against the Leon Valley Police Department; (vi) unlawfully arrest Miller and his family in retaliation for Miller's status as an auditor.

Here, the district court failed to view the evidence in the light most favorable to the party opposing the motion for summary judgment—the Plaintiffs-Appellants.[179]  The court failed to credit evidence that contradicted some of its key factual conclusions; the magistrate "improperly weighed the evidence and resolved disputed issues in favor of the moving party;"[180] and the judgment constituted a

---

[179] *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000); *Boudreaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005).

[180] *Tolan v. Cotton,* 572 U.S. 650, 657 (2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

forbidden intrusion on the First Amendment field to engage in political and symbolic speech.

## PRAYER

For the foregoing reasons, Plaintiffs-Appellants respectfully request that this court reverse the District Court's order granting Defendants-Appellees' Motion for Summary Judgment, and grant Plaintiffs-Appellants an opportunity to present the merits of their case to a jury.

SUBMITTED BY:
*S/ Brandon J. Grable*
**Grable Grimshaw, P.L.L.C.**
1603 Babcock Road Suite 280
San Antonio, TX 78229
**ATTORNEY FOR PLAINTIFFS-APPELLANTS**

---

242, 249 (1986))).

## CERTIFICATE OF SERVICE

I certify that on March 27, 2024, I electronically filed the foregoing document with the Clerk of the Court for the Fifth Circuit, using the electronic case filing ("ECF") system of the Court. All counsel of record were served via electronic service through the ECF system.

The Law Office of Charles S. Frigerio, P.C.
Charles S. Frigerio
csf@charlesfrigeriolawfirm.com
111 Soledad, Suite 465
San Antonio, Texas 78205
Telephone: (210) 271-7877
Counsel for Defendants/Appellees

*S/ Brandon J. Grable*
Brandon J. Grable

Date: March 27, 2024

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains 7,566 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because:  this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman font, size 14.

*S/ Brandon J. Grable*
Brandon J. Grable

Date: March 27, 2024